All right, the next case we're going to hear this morning is the NLRB v. Daycon Products and Mr. Rosenberg, whenever you're ready, we'll hear from you. Good morning, your honors. May it please the court, my name is Paul Rosenberg and I represent Daycon Products Company. We're before the court this morning to ask that the court deny enforcement of an order and decision in the National Labor Relations Board which reversed the finding of the administrative law judge regarding Daycon's right to correct a clerical error. I'd like to focus on two main points this morning. First, the critical error the board made in viewing this case as one about contract modification, not contract restoration. And secondly, why even under a contract modification framework, the board simply missed the mark on the appropriate standard upon which to rely. First and foremost, however, this is not a case about contract modification. It is a matter which asks whether the National Labor Relations Act requires that a clerical error become so sacrosanct in a contract that an employer can potentially be bound to it indefinitely. Indeed, in 2004- Let me ask you about this generally because it sounds to me like we are involved to some extent in unilateral error of contract law principles. And courts generally will correct error. A bank accidentally puts a amount in your bank account and you end up spending it. Usually the courts will give that money back to the bank even though it's been spent and relied on. And the courts like to correct errors. And for purposes of the argument, I think we have to assume it was an error. It's not conceded, but we assume that. Is there any notion that equity and latches comes into play in assessing whether we correct an error? I mean, here we're looking at five years. We have three years under the original contract and the employees, these eight employees, were paid at the higher rate. And they spent the money. They're on tight budgets. We're not talking about a lot of big salaries. We're talking about people who I think the highest income on any of these employees was under $20 an hour. And it went down from there. They spend it for years. You go into a contract negotiation and the union asks you for a list of the amounts being paid to the employees. And you report the error. You tell them that they're being paid at a higher rate than they really should have been paid, according to you. They say they rely on it, but whether they do or not, they enter into a new contract, add $0.55 an hour on everybody, and continue to pay these people now at $0.55 higher, plus that error amount, for another couple of years. And now you're near the end of a second contract and you're saying, holy mackerel, we made a dollar error way back five years ago. Isn't there some point we should be calling it quits? I don't know what the principle is, but there's a lot of intuition on that, isn't there? I think there is certainly intuition on that. And I think you're talking about, there's two equitable principles at play here. The first equitable principle is regarding the National Labor Relations Act. And the fundamental principle of the Act is the promotion of industrial stability. So as the board found in the Foster-Transformer case, in which it explained nothing in our law requires the perpetuation of an error, even if the employer went down a mistaken course. Now, yes, I think there's a... You're asked to give a list of the employees and their rate to pay. Right. And you provide that before the negotiations begin. And the union says they relied on that. I'm not sure they did. They just added $0.55 on it. But let's say they didn't rely, but you still gave it to them and they assumed those amounts. They were adding $0.55 from their point of view on that and entering into a new contract. Does that impact the analysis, the fact that you perpetuated the error by relisting the amounts in error? No. Those rates which were given to the union were the rates that employees were being paid. I understand. But embodied in... And the rate of them in error, what, $1 an hour more or something? I mean, each one there was different amounts depending on the employee. But embodied in there was an error. It's very similar to the Dierks Forrest case, in which case, in that case, the employer basically classified the individual wrong. They were classified in their payroll system as a trucker when in reality they were a welder. So the employee was being paid for something they didn't do. So what I'm getting to is if you discovered this two years after the first contract and you went to the union and said, hold it, we've made a mistake in the way we're paying them. I'm not sure we have to come to your union, but just be advised we're going to adjust these people's pay to the correct amount. I think that's a much more powerful case than running through that contract, supplying the information again by error, into a second contract two-thirds of the way through and now wanting to go back and correct everything. These people have spent the money, and if you're really right, you're entitled to have them pay back that money, which they paid for their electric bill and their rent and all that. I think, well, first, we didn't, Baytown didn't ask to have the money. I know you didn't, but I guess my original question is, do we apply equity in construing a contract and adjusting an error? In this case. Not this case, generally. Is that appropriate? Generally, yes. I mean, equitable principles come into play when you're construing whether you should correct an error. And I'll address this case, then. In this case, we're only one contract removed from when the mistake took place. I can concede that at some point a term can become embodied in the contract. The Bonnell case, for example, which the general counsel cited to. In that case, there was a formula in place for 18 years. In that instance, it became embodied. You give yourself employees who got it every month or every two weeks or every week, however they're paid, and they spent the money. And now you say, oh, we're not claiming that because it would be a hardship. But the very fact that you recognize that you can't claim it reveals an equitable principle. It reveals the principle that in this context, it's pretty hard to correct the error. If you're really going to correct the error, you have to go back and collect from every employee for five years. And not only would it be that foolish as a business matter, but it's probably impossible. Unless you're going to, I don't know what you're going to do. $80,000 or whatever. I agree, Your Honor. It wouldn't be a wise business practice to try to collect the money. But if it's totally impractical to do that, doesn't that inform the equities if you can't really correct the error because so much water's gone over the dam? It's like maybe your 18-year hypothetical where there's a lot of reliance. I don't think so. I think, I mean, we could imagine for a second that the shoe here was on the other foot. And the union came to DACON and said, you've underpaid employees. Two plus two equals four, and you made it equal to three. It's easier to correct that because you guys are rich and they're poor. You're right. I mean, the buck stops with DACON. They're issuing the checks. But on the same token, the union here could have recognized the error. When those rates were given to the union, if you looked on page 127 of the appendix, they're out of whack. For example, one of the employees, Mr. Bridges, he's only $0.10 below what at the time was the top rate. Yet another employee who was hired just four months previous to him is $0.50 below the top rate. In each instance, there's an out of whackness. They should have been able to discover that. If they could have discovered it, you would have discovered it even more clearly. I'm suggesting that the act is principled upon good faith of both parties. Employees could have seen that they were being paid over and above what the contract said. The union could have seen that the seniority principles, which they bargained and successfully have bargained for, that are embodied in the contract, they could have seen that those rates were out of sync. We could have recognized the mistake. Are you in negotiations for another contract? This is 213. It's very funny you would ask that because we are meeting tomorrow. We are meeting on January. We just had another meeting recently, and we were just exchanging emails yesterday. I think the next date we set up was very soon, February 12th. I know. They're prepared to hear about the mistake, and they'll do some justice for that in the negotiations, these current negotiations. Maybe we can adjust it. But that's the very essence of the error that the National Labor Relations Act made, that the board made. By not permitting DACON to correct the error, that has elevated the issue to the top negotiating point. And the union, according to the board, certainly does not have to concede the point that the wages can now be corrected. I'm sorry. I don't think I followed that. DACON could have waited until the next bargaining round, which is now, and it still would be a top issue on the table. So I guess I'm responding to your point that it was the board's decision against DACON that somehow exacerbated the potential for difficult bargaining or industrial strike. Sure. Because if DACON was permitted to correct the mistake, that issue of whether the employees at issue were overpaid or underpaid wouldn't be the top negotiating issue. No. They're still overpaid. There's no dispute, accepting the record from your perspective, that they were overpaid. Right. Correct. I think there's a difference from a framework if we go into negotiations and the board says to DACON there was a mistake, clerical error, you were able to correct those. That starts a new baseline from which to bargain at. On the other hand, when the board says no, you cannot correct the error, then the rates are starting off from an elevated standpoint. And that's a different baseline. Okay. I see your point. I'm not so sure. I mean, bargaining is bargaining. There was a little bit of that in the last contract. I know your position is there were not specific amounts put in there, but there still was a list that was on the table. The list you provided them is the amount everybody was paid, and the collective bargaining agreement added 55 cents not on those rates but on whatever was being paid. Right. But there's an implicit elevation at that point a little bit. They've been going on for two years now under that. Right. But I think, and you mentioned our position, I think, too, the rates are not in the contract. Right. Certainly, then, the complaint here alleged 8D of the act, as explained in the Bath and Ironworks case, any time an 8D claim is made, the sound arguable basis standard is necessarily implicated. That means all DACON needed was a sound arguable basis for its interpretation of the contract. And what would that mean in this context? In this context, it would mean that the increases should be added to an individual's correct rate. And why does that sound unarguable? I think it's sound because the opposite says you have to give the increases no matter what, even if there wasn't a mistake. Because of the kinds of equitable principles that Judge Niemeyer was alluding to. I'm sorry. I think it's sound because otherwise we then are in a system where the error, and I recognize, Judge, your point, Your Honor, about the practicalities of trying to collect the money. The other point that is hinted at is errors should be corrected. To me, that is sound. But that doesn't end the story because when there are equitable principles, such as you were in a position to discover the error earlier, and somebody who was looking at your list of payments could have understood some of these discrepancies. Why is he being paid almost the same amount as this guy? And then you come up with a new list when you're specifically asked that again perpetuates the error. There's a little bit of an estoppel notion, a latches notion. You sat on it or a neglect notion. You didn't discover it. And these mitigate the error from their point of view. In other words, it's a new way of life. Now, I know when two countries get together and they dispute a border and they go for 50 or 100 years, they still dispute it for some reason. You know, time just doesn't heal it. And maybe time doesn't fully heal this, but I understand your argument fully, and I think it's somewhat challenging. It seems to me the union is in a far more difficult position with respect to bargaining than you are. Well, I think they're not so sure. Right. Why not? I mean, if I'm a union member and I got this guy making more than I did, I do, and now we're up for renegotiation of a new CBA, I'm going to say to my union woman or guy, so what's up? You know, how are we going to fix this? How are we going to fix this? And so the company comes in and says, okay, union, how are we going to fix this? Because you've got a problem, because you've got dissension in the ranks, because you've got people making more than they should. I see my time's up. Could I add? Yes, if that's okay. I think your question assumes that the union is acknowledging there was a mistake. They have never, they have one person that never gave that acknowledgement. I'm sorry, what? Can you demonstrate it's a mistake? Oh, yes. Objectively demonstrate it. Yes, in fact, in the hearing, in the transcript, we walked through the exact math, and it was clear that there was an error. Okay, and I don't think the union would admit that until bargaining time. Right. I wouldn't advise them to admit it during the proceedings. But I think then the question is, I mean, from an equitable standpoint, when does it stop? If the error goes on forever, the employees are indeed getting a windfall, and it's compounding. Oh, you bargain over it. It stops as a consequence of country-to-country bargaining over the boundary. No, but we never bargained over it. I know. You are now. That's my point. You continue to pay the mistaken rates, do the end of the extant contract, and now you're back to square one. All issues are on the table. But the union in your scenario, Your Honor, has no obligation to agree, in which case we're stuck paying mistaken rates perpetually. You don't have obligation to agree either. I mean, you're in good faith in trying to correct the error. Sure. We're in good faith in trying to correct the error, but without being able to correct the error. Why? You don't have to agree to what they demand, do you? You just have to negotiate. We just have to negotiate. In good faith. In good faith. Right. But then if the two parties don't agree, we risk everything, what I will say, all the bad stuff that comes with that, a possible strike, employees out of work, all the stuff that comes with it. Why should an error, something everyone acknowledges is an error, be the overwhelming course of discourse? But all that bad stuff is what focuses the mind. That's what focuses the mind. Would you ask for correction just prospectively? Yes, just prospectively. We never sought to correct the error going back. Just wanted to stop the error prospectively, to cut it off, to stop it from compounding over time. I'll reserve the rest for rebuttal. Thank you. All right. She? Let me just pick up where, and I'll let you get to your argument, but just where I, the last question. What's wrong with correcting an error prospectively? Well, there's nothing inherently wrong with correcting the error inherently, but I think that doesn't address what happened here. So specifically, I want to say, because you correct the error, the board expressly passes on the issue of could they have corrected it during the term of the first agreement, the predecessor agreement, where the error allegedly happened. And I do want to point out, I don't know that it's entire, I don't think the board's decision is entirely clear on whether or not there was an error. So I just want to put that out there. The board says two different things. The board says on the first page of the DNO that there was an error, but then the board says on the second page of the DNO that if there were a mistake. So I'm not sure that the record is as clear as sort of what was reported. Well, it did want to make a holding, but I'm assuming that the company could demonstrate to reasonable people, and I'm assuming you guys are reasonable, that there was an error, and you could look at it and say, indeed, there was. It's a little out of whack. It seems to me if they're not asking to correct the error, like putting the money back in their bank account that you spent, but just going prospectively to get it on the right way, why isn't that really good for both sides? I guess the really critical thing that I think is getting lost in the conversation when we're talking about an error and a mistake is that we're assuming that that mistake carried over without the ability to correct it, or that it still was a mistake in 2007. You get all those points. It could have been corrected, but it looks like it wasn't. Sure, but in 2007 when the parties sat down to negotiate the contract and they entered into an agreement that said as of... Sorry, we get all that. I guess I'm not being clear then because what I'm saying is it's not a mistake if both parties had a piece of paper in front of them, understood what the wages were in 2007, and agreed to pay those wages. They did. You're sort of saying there's an ovation in a new contract, a new rate. Absolutely, sort of what Judge Davis was getting at, that it's not going to be an indefinite... But you can't claim that completely because they gave you a list, pursuant to a demand, of the rates. The union submitted information. Then you negotiated your contract, but it doesn't look like you addressed each individual employee. It looks like you just gave across the board $0.55 per hour. The contract does call for $0.55. So their argument, and it looks like it's readily supportable, is that they just perpetuated the error in that mechanism. They had a list which had the error in it, added $0.55 per person, which is negotiated and agreed to, perpetuation of the error. They didn't realize, and you didn't realize, during those negotiations that the list had an error. Right, but I think what the board... So the board has a two-part analysis, or a two-part step that it went through on its decision order. It first finds that the current wage, that they specifically say, there was no mistake as to the basis for computing wages and wage raises in the contract. No, there wasn't. It doesn't address it. It's silent. It gave 55% an hour on a pre-existing, whatever their rate of pay was. But the rate of pay that the parties had on the table was a mistaken list. That's the list they provided you pre-negotiation. That was the list certainly provided during negotiations. So I think my first response, which doesn't appear to be gaining much traction, but the first response is that the board did not find that the most critical part of the analysis was whether there was a mistake and who was at fault in that mistake. The board found that the parties offered, that the parties entered into a contract knowing at the time what they entered into, that they had the information on the table in 2007 and that they entered into that contract. And it was during those negotiations where sort of the right renewed to correct a... Well, we don't want to get too metaphysical, but there is a difference between an intentional act, which is, there's no mistake in entering into the act, entering into the contract. But the mistake here was in the information. It was mistaken, erroneous information on the basis of which intentional, knowing acts were engaged in. Right, and I think from the board's perspective, what the board I think is saying in their decision and order, is that when the parties executed the agreement, the wages that were reported in the 2007 document, that those wages, that is what the parties agreed to. The parties agreed to pay... I'm sorry? There are no wages in the agreement. I'm sorry, but what the parties agreed, what they say is retroactive to February 1 and effective on March 3, 2007. So the board read that as, what were the wages on February 1, 2007, and that is what the parties agreed to. And that's because the board doesn't do breach of contract cases. Right? The board does unfair labor practice charges. And so it seems to me the board had to say what you just said the board said to stay away from any suggestion that they were adjudicating a breach of contract. Right, it was pled in the complaint as an 8A185 violation. Exactly. Why didn't you bring a 301 action? That's not my... No, that's the prosecutorial branch. That's the general counsel's, how they decide to progress with the complaint. Fair enough. But I'll move into sort of, I think what, Judge Niemeyer, you might be more interested in is this equitable notion or latches or sort of... And I think it's not unusual in contract law where you have what I think both parties would agree are innocent parties to everything. The employer produced the information, the union relied on it, they entered into an agreement. So you don't have a party that knew something was wrong. There's no suggestion the union acted with bad faith. There's some suggestion the union could have discovered it. But that accusation or that suggestion made by the employer goes just as well to itself. Certainly. That's what I'm saying. I think everybody... That washes out. The little bit of troubling thing is that these eight employees are a little bit out of whack and out of scale if we accept that there was an error. And the question is what's the best mechanism to correct it and do the courts have to abdicate and yield to the next negotiating session? It seems to be much easier if the union were to say, we'll take care of that in this next negotiating session and give accommodation to the error. That would end it. But it seemed to me because that's perspective. You're at the next negotiating session. They raised it. I think they might be too beyond because this agreement expired 2010. Yeah, this is the second removed negotiation. Right, so I'm presuming I represent the board so I couldn't speak to the negotiations between the union and the... I keep looking at you as the union. I know, I know. I'm wrong. But we're in the third generation of this mistake. Certainly. And a union intervening council might be able to speak more to what the state of the negotiations are or... Plenty of time to think about what it's going to say. But I think... With respect to the board then, the question is why wouldn't the... If they found there was an error on the first page and then they said assuming it's an error, why wouldn't they just correct it prospectively? That's sort of harmless, isn't it? I think what they decided to do though was to say that... to the extent then that the board talks about an error. They say, what I was starting to get to, is that where neither party is to blame, a basic premise I think in contract law, is that where the harmful consequences then flowing from that error, assuming both parties are not at fault, shouldn't flow to the victim of the error. So I think it's that principle underlying it where the board said... Or the beneficiary of the error. We never... The law generally doesn't allow beneficiaries of errors, unilateral errors. The best example is... It often occurs that the bank makes an error in your favor. They can call it back. Right. And I think overarching all this too is the board's understanding that the contract, when all of this was going on, the contract... I believe the correction was made in May of 2009 that the contract was expiring eight months later at the end of January in 2010. So I think the board could reasonably consider that too, that the best thing going forward is they viewed it as a contract, offer acceptance, execution. And then moreover, if there were an error, we're not going to blame... Is there a reason that it was part of the negotiations in 2010? That's not in the record and that I don't know. I'm sorry. Let me make sure I understand the question. What was part of the negotiations? In other words, they discovered the error in 2009. They did discover the error in 2009. And the question is, did they try to correct the error in negotiating the 2010 collective bargaining agreement? That's not in the record. Again, you might be able to ask counsel for the union. He may... It's not in this record, but he might be able to offer... Okay. All right. ...specifically what happened during the... And then there was only... Maybe I'll just... Are there any other questions? I think that's fine. Well, I did want to hear you on sound arguable basis. Okay. I was going to say something that I was trying to figure out. Am I doing too much? I was trying to hedge my bets on that, but I'm happy to answer a question on that. Because I know that the respondent does dedicate a lot of pages to this bath iron concept that the board has entered into on contract modification, and then the board doesn't speak to that. And so what we have here is then the board, because they submitted it to the board. It was an argument that was in the briefs to the board. So we have to assume the board considered the bath iron argument... But they didn't say anything about it. They didn't say anything about it because they... Implicit in that, right, is that they disagreed, that they either found that the contract was clear on its face. That's really the holding of whether you agree or not based on whether there was an error and how the board treated that. That's what the board found, is that there was... I mean, that's clear in the DNO where they say there was no mistake as to what the wages were. That's... They really find an innovation when the contract didn't address the error. In other words, the contract didn't substitute new rates or the error rates. All it did is added 55 cents on the rates that the employees were being paid. In 2007. Right. Now, if it actually had a list of the employees attached, their rates, then I think that ends it. I think I... I mean, I'm going to speak off the record a little bit here just based on some of my own experience. I have barred contracts before, and I think it's actually unusual to put, outside of classification, just because you do have privacy concerns, right, to have a name, and then this is how much barbshearing is making. But that's Judge Davis's question, is what's the board doing? Why isn't that a reasonable position to be taking in this case? And I do think the answer to this, while not clear from the decision itself, but I think in what they did in completely rejecting that argument and not addressing the sound, arguable basis claim, is that the board disagreed, that either there was, that on its face, they say that it was clear. They were talking 2007 wages. What if we disagreed and found that there was a sound, arguable basis? What should the remedy be? I think at the very least it has to be remanded to the board then to determine. You don't think that's for us in the first instance? Probably not in the first instance, no, because I think there's also some question whether the board, because there's also a line of cases with board law that even where there is a claim, as you have here, of a contract modification that's requiring the sound, arguable basis rationale, that the board doesn't necessarily agree, where the board has said this is clear on its face, and this isn't the example of the case, but for instance if the contract says 55 cent raise every year and the employer paid 45 cents, it's a contract modification. They're not paying what's called for in the agreement. The board wouldn't consider a sound, arguable basis to claim, I paid 45 cents, that's fine, it's sound, it's arguable. So there is a line of cases then where there's a contract modification, but where the board finds that the contract language is clear, and therefore they don't go down the road of a sound, arguable basis. So I think that that is what we have here, where the board opted not to go that route, because they said we find no mistake as to what the contract said, 2007 wages. Their mistake according to the company, DACON, is that in concluding that the contract addressed the issue, they sort of assumed that the rates were attached, that list was attached or something, because they couldn't make that statement based on just the 55 cents over what they're being paid. I'm not sure. In other words, they could not reach the conclusion that the contract was clear in addressing it and providing a new agreement. I think I do understand their argument to be that too, but I think the board, again, says 2007 wages, clear. All right, why don't we hear from Mr. Mooney. Thank you. We talked a lot about you. Wouldn't be the first time. Good afternoon. Rather than doing prepared remarks, I think I'd like to get right to the questions that the court raised on a number of aspects. In the first instance, there is no outstanding contract. There was no 2010 contract. We ask you to take judicial notice of another board decision involving DACON where they committed massive unfair labor practices. There was a two-and-a-half-year unfair labor practice strike. The board found it was an unfair labor practice strike. The D.C. Circuit just enforced that last November, and the returning strikers went back to work after that decision. That's why we're in bargaining now. In terms of the equity issues that you raised, Judge Niemeyer. I mean, there's a little bit of all the benign good faith I was assuming that the two of you could get together and resolve mistakes like this. That's almost impossible. No, we'll bargain. Oh, I know you will. You have to. No, they have to. They have to. They have to. They have to under pain of the board's order complying them to comply with the court's order to bargain in good faith and cease and desist the massive unfair labor practices and pay the millions of dollars to the strikers who are out for two-and-a-half years. What did this dispute, what was the connection between the breakdown and this dispute? None, some, a little, a whole lot? This dispute involves wages. Wages are always part of the disputes. But I mean specifically the unions stiff back resistance, and I don't say that pejoratively, to remediating this situation that arose with this mistake, this alleged mistake. Well, let's put this in the right framework. This perceived, and that's the board's decisions language mistake, occurred sometime during the 2004 agreement. Right. There was bargaining for the 2007 agreement in which the union relied on the wages because the prior contract just used percentages, and they had been applied all over the lot. Okay. And the union business agent who was negotiating this contract for the first time rather than somebody else. So there's peace in the land. What happened? They bargained, they come up with the contract, but it's not just wages that are part of that bargain. If you take a look at the record, and you will see that a variety of issues changed between the 2004 and the 2007 agreement. The work week, wages, time clock issues, leave issues. Okay, so this particular glitch, if you will, had little to do with the broader collapse of... In 2007, we had all of these issues that were discussed, and during the course of the 2007 agreement, we have Daikon saying, excuse me, we think we made a mistake, and we're going to unilaterally take that out of the deal. And we're not going to unwind the contract. All the other things that we bargained back and forth over 10 or 15 sessions, whatever it was, those stay the same. We're just going to cherry pick and take that unilateral reduction. Sorry. The union said, no, you can't do that. You know, this was a deal. You're trying to undo part of the deal, but not all of the deal. The time to do that, if you look at Mr. Weber's letter, in April 2009, I think it's GC9, he says, the ship has sailed on 2007. Talk to us at the next collective bargaining agreement, which was the next year. So that brings us to what happened in 2010, and I want to be careful I stay within what the board... So you can take judicial notice of what happened in 2010 by reason of the board's decision, and the D.C. Circuit just issued a per curiam. We didn't even have oral argument. The court scheduled oral argument and then canceled oral argument. So that happened last November. Was the error one of the subjects of discussion in 2010? Wages were part of the discussion. We've never conceded it's an error. We were negotiating for higher wages for everybody. I know, but was the 2010 wage issue addressed like the 2007 contract, just a certain amount of dollars on top of what they're being paid? I am not sure, Your Honor, because we never came to a conclusion of 2010 bargaining because they unilaterally implemented their terms and conditions, which is what caused the strike. And I frankly just don't recall the various issues that were outstanding at that time when they unilaterally implemented and the union went on strike. I just don't recall. It's probably in the NLRB's record or the ALJD from the other DACON case. But that's... You know, I deal in the real world. The cases and everything are nice, but when we look at this through the prism of the real world, collective bargainers, you can't undo the deal. You do it, you fix it the next time. All of the cases, if you put them in an analytical framework, can generally be put into cases that talk about contract formation or contract administration. And a lot of the cases, and there's plenty of cases that everybody's cited, about fixing the mistake, those are almost always contract administration cases where you are returning people to what they negotiated for. If I'm getting paid as a welder and I'm a fork man during the term of the contract, well, I go back to what I should have been. That's what we talk about when we're making it right. But when we're talking about contract formation, and that's where the board's equity principles, to answer your question that you raised early on, the board does recognize equity principles. All of 8A-5 is equity. It's good faith. Well, that is, but I'm thinking in terms of contract law, when you're construing a contract or you're applying the doctrine of unilateral mistake... And the NLRB specifically... And the question is, would you, in applying the doctrine of unilateral good faith, consider equitable principles? Yes, and the board does, and the board did in this case. On A-78, in the appendix, page 2 of the board's decision, it cites North Hills. And North Hills says when there's a unilateral mistake and the other side doesn't know about that and good faith, then the burden stays with the party who committed the mistake. So the principles there are in the major premise category. In the minor premise, it's manifested in the line of cases like North Hill. In this case... The burden of what? Who bears the burden of the mistake? Clearly they bear the burden of it, but the real question is, do you perpetuate it or can you correct it? Well, perpetuate is forever. Forever. Well, no, it'd be to the next degree. Until there's a... But their relief was prospective, and I think if you had the real remedy for mistake, you undo the mistake. But in this case, they couldn't really undo the mistake. Well, they... Because you can't, as a practical matter, go back and collect from each one of these employees over those years. And so their relief was a more pragmatic one, which is, well, let's at least get the right structure in place for the next collective bargaining. Well, I invite the court to read the record on this. We just want to collect prospectively because first they said that. Then when the union said, that's not right, they said, in that case, we're coming after everybody for $100,000. And when we said, okay, if you're going to do that, we'll pursue all of our legal remedies, then they went back to, okay, we won't do that. So it was never just, gee, we made a mistake, let's all try to get along. And why didn't you go to the 301 route rather than the NLRB route? Well... Not that that's particularly relevant, but I'm just curious. We were in 2009. We were going to be negotiating a new contract in 2010. We would have had to have gone through the grievance procedure. We couldn't file a 301 directly. Right. We'd have to file a grievance, we'd have to go through the arbitration, we'd have to pay an arbitrator, and by the time we got a ruling, we probably would have been in bargaining with the next collective bargaining agreement. I mean, just the timing of it doesn't make sense. But in the real world, as well, the expense of it. Okay, fair enough. I mean, it's, you know, this is not a client with unlimited resources. The NLRB, we thought we had a good charge, and so did the NLRB. We think the holding of the board is perfectly consistent with the rationale it has followed. In other cases, there's nothing unusual about this case. The remedy for the respondent is to negotiate in good faith and pay what they promised to pay in 2007 until that happens. Okay. Thank you, Your Honor. We still have four minutes left to rebuttal. Mr. Rosenberg. Thank you, Your Honors. I'd like to spend a few minutes, or the time I have, talking about the negotiations that ended up leading to a strike, because I think Mr. Mooney skirted around some points there. The mistake that was made here was what was called the employer in 2004-2007 mistakenly paid quote-unquote catch-up raises. The 2001 contract had a catch-up provision. 2004-2007 did not, but we paid it. 2007 had sort of a halfway of a catch-up. Sure enough, what do you all think was the most important issue in the negotiations that just broke down? It was catch-up. So to say that the mistake did not turn into the key overriding issues in the negotiations that just occurred is just grossly mischaracterizing the facts. And I don't want to go into that. I'm sorry, when you say catch-up, you mean they were trying to bring the other 1,000 employees up to the 8? That's exactly what they were doing. Their proposal was that everyone catches up immediately to the top rate. And guess who were the most impacted by that proposal? The 8 individuals whose wages we corrected. So while the D.C. Circuit may have spoken, and we of course respectfully disagree, there is certainly no dispute about why those negotiations broke down and how the correction of the ear indeed led to the breakdown in negotiations, which I think is a very important point, because it leads to the whole point of our original argument that the act is meant to promote industrial stability. And by not allowing DACON to correct the ear, everything that the act is meant to protect didn't happen. The Foster Transformer case, to stop the perpetuation of mistakes, that's the result that the board cautioned against. The board took a completely opposite approach. Secondly, I'd like to address... But what's the remedy that you would ask for now? That DACON was permitted to correct the mistake. But what does that do? What do you do now? I mean, one agreement plus current negotiations upcoming beyond that. Right, but I'm sorry. The remedy would be that employees' wage rates, the 8 individuals' rates, could stay at where they're at right now, and they would not be increased to what they were had the ear not been corrected. And I'd like to address... But why do we care about that? I mean, I know why we care about that, but why do... You're going to bargain. Or not, but you're going to bargain. Well, we're going to bargain, but as has been shown, it is very difficult to reach an agreement. And as Judge Niemeyer made the assumption that two reasonable minds can get together, these two reasonable minds aren't getting together. So you want our thumb on the other side of the scale to foster more collaborative bargaining? No, I want... I think the board put its thumb in the collective bargaining scale. What Congress has instructed the board to do. When it said, the board's not supposed to interpret contracts. When it said its formulaic theory that arrested its case automatically meant that the rates were in the contract, it inserted its interpretation, maybe it's reasonable, over a perfectly plausible alternative that you shouldn't have to pay increases over and above a mistaken weight. And I'd like to address the North Hills case briefly. That case and our case are apples and oranges. In North Hills and in Ripple Steel, which the charging party also relies upon, those are cases of buyer's remorse. Hey, in North Hills, we proposed to give you 35-cent increases. Then we get a deal and the employer says, hey, no, we meant 15 cents. In Ripple Steel, we propose employee by classification. Hey, we didn't mean that. That's buyer's remorse. That's not this case. This was a clerical error. It could have been discovered. It wasn't discovered. But once that error was discovered, Baycon was within its right under the Foster Transformer precedent to correct it, not doing so. Foster Transformer was not a new contract. It wasn't, but... So it's not controllable and only marginally persuasive. Well, but the bargaining relationship between the parties doesn't emanate from the contract. Even when a contract expires, you have to maintain the status quo. So the equitable principles upon which Foster Transformer relied upon certainly apply here. Otherwise, like I said, we end up in a system where one party can always benefit from a chance error,  And those facts, unfortunately, played out here from 2007 to really the present. Thank you very much for your time this morning. We'll adjourn for the day until tomorrow morning and come down and greet counsel. This honorable court stands adjourned until tomorrow morning at 8.30. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Roger L. Gregory, Andre M. Davis